CALHOUN & BEDDINGFIELD, plaintiffs in error, vs. THE MANUFACTURERS' BANK OF MACON, defendant in error.

NOTE.—WARNER, C. J. did not preside in this case.

C. & B. drew a special draft in favor of M. B., on C. & G. "against 172 bales of cotton, the title of which is conveyed to M. B., and is consigned to you, (C. & G.) subject to the payment of this draft." C. & G. accepted the draft. Upon a suit by the payee, vs. the drawers, the Court charged the jury, that "under this contract, the plaintiff had the right to take control of the cotton consigned to C. & G., and take it out of their possession." Held that this charge was wrong.

Assumpsit, &c. Tried before Judge COLE. Bibb Superior Court. November Term, 1867.

Calhoun & Beddingfield *vs.* Manufacturers' Bank of Macon.

Calhoun & Beddingfield drew their bill of exchange or special draft as follows :

"MACON, GA., November 3d, 1860.

MARKS :
S. J. R.—28
C. C.    63
W. O. L.  25
J. F.    56
——
172

Fifteen days after date, pay to the order of the Manufacturers' Bank of Macon, eight thousand five hundred and thirty-three dollars and forty cents, for value received. This draft is drawn against 172 bales of cotton, marked as per margin, the title to which is hereby conveyed to said Bank, and which I consign to you, subject to the payment of this draft to said payee or his order.

Yours, &c.,

CALHOUN & BEDDINGFIELD."

To CRANE & GRAYBILL, Savannah.

Crane & Graybill accepted it, and it was endorsed :

"Pay A. Bruce, Cash., Esq., or order.·

G. W. HARDY, Cashier."

It was also endorsed with a credit of $7178 54, dated May 1st, 1861. The money was advanced by the Bank, the cotton sent to Savannah, the draft went to protest and formed the basis of this suit.

The defence will be seen from the facts :

The plaintiff read in evidence the notarial certificate of protest of said draft. It was in the usual form, dated November 24th, 1860, and stated the presentment and demand, and refusal of payment on the 21st November, 1860, and that on this last day, notices of such demand, etc., for Calhoun & Beddingfield and G. W. Hardy, Cashier, were mailed by the Notary Public, under cover, addressed to the latter at Macon, Georgia.

Plaintiff then offered G. W. HARDY as a witness : On his *voir dire*, it appeared that though not when the draft was made, nor then, a stockholder in the Bank, yet in the meanwhile, while the Bank was in suspension, he had been, and thereupon defendants' attorney objected to him as incompetent. This objection was overruled by the Court.

HARDY then testified : that he was the Cashier of the Bank

at the date of the draft and when it fell due, and Mr. Armstrong was the book-keeper. Hardy received the protest and notices by mail, from Savannah, and although he did not recollect what was done in this case, his uniform custom was when such notices had to be re-mailed, to do so, and when they had to be served personally in the city, to hand them over to Mr. Armstrong for service, and he believed he observed this custom in this case. He did not know what Armstrong did with the notices.

The defendants were in the Bank some four or five days afterwards, and from their conversation in relation to the transaction in Savannah, they knew of the dishonor of the draft. The understanding at the time the money was advanced, was, that if the cotton fell short, the drawers were to make up the deficiency and the difference between the face of the draft, and the credit thereon is the deficiency. Here, by permission of the Court, the draft was read in evidence, defendant objecting thereto.

Plaintiff having closed, defendant read the interrogatories of CRANE & GRAYBILL. They testified that they knew of the shipment of 172 bales of cotton by Calhoun & Beddingfield, marked (as in the margin in said draft) consigned to Crane & Graybill, and of the draft already described. The cotton was received by Crane & Graybill (after they had accepted the draft) and placed in store.

After offering the cotton, and finding the market depressed, owing to the difficulty in negotiating, they wrote to Calhoun and Beddingfield, and the President of the Manufacturers' Bank, who owned the draft, to have it removed, or to allow them to ship the cotton to Boston. Calhoun & Beddingfield replied that Mr. Bond, President of the Manufacturers' Bank, would instruct them about the cotton and draft, and Mr. Bond wrote them that he had instructed Mr. Hiram Roberts, President of the Merchants' and Planters' Bank, Savannah, who held the draft, to let it lay over and allow then time to sell or ship the cotton.

The day before the draft fell due, Graybill saw Mr. Roberts, who confirmed what Mr. Bond had written, and agreed

to allow them to ship the cotton to Boston by steamer, then on the way from Boston to Savannah, and give him a draft at thirty days, to take up their acceptance. The day the draft was due, Mr. Graybill saw Mr. Roberts again, who fully confirmed the arrangement made with Graybill, and to make Roberts safe in the meantime, Graybill gave him the warehouse receipt to hold. On Sunday morning, four days thereafter, they got a note from Mr. Roberts through the Post-office, saying he had concluded to ship the cotton and they could still have the control of it if they wished. On Monday morning, 26th November, 1860, Graybill called on Roberts for an explanation; he admitted his engagement to allow them to ship the cotton to Boston, but said he had changed his mind. They declined to have anything to do with the shipment to Liverpool, and demanded the acceptance and bill of expenses on the cotton, which was refused. Graybill then went to Macon and saw Bond, President of the Manufacturers' Bank, who said Mr. Roberts had written him that he had agreed to allow them to ship the cotton to Boston, which was perfectly satisfactory to him, expressed surprise at the course of Mr. Roberts, said they had acted perfectly right, and that their acceptance should be given up, and their expenses on the cotton paid, that he would write Mr. Roberts the next day about it. This conversation was in the parlor of the Manufacturers' Bank, on Wednesday, the 28th November, 1860, first between Mr. Bond and Mr. Graybill, and was then repeated in presence of Mr. Calhoun.

If they had been allowed to carry out the arrangement entered into with Mr. Roberts, to ship the cotton to Boston, it would have paid out in full, and the reason why they confidently assert this, is, that one lot of 180 bales of cotton consigned to them by another party which they did ship by the same vessel on which they had arranged to ship this cotton, and costing as high or higher than this, did pay out in full. If they had been permitted to hold the cotton in Savannah twenty or thirty days, it would have paid out in full. If the cotton had been sold in Savannah, it would have paid the draft, but not the expenses. The cotton was shipped to Liv-

erpool by direction of Mr. Hiram Roberts, President of the Merchants' and Planters' Bank, without their knowledge or consent, it having been put on board the vessel before they were apprised of it. If they had not made the arrangement with Mr. Roberts, by consent of Mr. Bond, to ship the cotton to Boston, they would have made other arrangements and taken up the draft.

Graybill says Bond, President of the Manufacturers' Bank, stated to him, and he is confident repeated in presence of Calhoun, that Roberts had shipped the cotton on his own responsibility, and that he should look to him for any loss on it.

In answer to the cross-interrogatories they testified : They saw the samples of the cotton and offered it for sale, and could have sold it the day it arrived for sufficient to pay the draft the day it was due, but the class of buyers then in the market had some difficulty in negotiating to pay their purchases, but for the interest of all concerned, they feared to risk it.

The cotton was in their possession as per consignment, and they made a positive agreement to ship it to Boston, but did not turn it over to any one ; but on the day the draft was due, they left the ware-house receipt for the cotton, under a positive engagement with him to ship the cotton themselves to Boston by steamer, Joseph Whiting, expected in a few days. The cotton was shipped to Liverpool within three or four days after maturity of draft, without their knowledge or consent, and in violation of the agreement. Cannot state positively that the cotton would have sold for amount of draft the day it was due, nor what would have been the deficiency.

They proposed to ship this cotton to Boston as before stated, and made arrangements so to do, and only under that positive arrangement lodged the ware-house receipt with Mr. Roberts. Calhoun & Beddingfield did consent to their shipping it to Boston, but they have no knowledge of their consenting to its shipment to any other place.

Defendant also read in evidence Mr. Bond's letter, as follows :

"MACON, November 19th, 1860.

MESSRS. CRANE & GRAYBILL :

*Gentlemen*—We have written to Mr. Roberts to note the bill drawn by Calhoun & Beddingfield, and hold on a few days and give you a chance to sell or ship to raise the money.

Yours, truly,  E. BOND."

Defendant closed, and plaintiff in rebuttal, examined E. BOND, President of the Manufacturers' Bank. He testified that he wrote the said letter just before the draft was due, and also instructed Mr. Hiram Roberts, the agent of the Bank in Savannah, to have the draft duly noted, but to give Messrs. Crane & Graybill, acceptors, a few days indulgence in which to sell or ship the cotton, that soon after he received notice from Mr. Roberts of the shipment of the cotton to Liverpool, he saw Mr. Beddingfield and informed him of the fact, and asked him if the shipment of the cotton should be on account of the Bank or on account of Calhoun & Beddingfield, who replied that he thought the shipment to Liverpool was about as good a disposition of the cotton as could be made, and that the shipment should be on account of Calhoun & Beddingfield.

On cross-examination he said he did not inform Mr. Beddingfield at the time that if the shipment should be made on account of the Bank, that the draft would be given up, and that the expenses on the cotton in Savannah would be paid by the Bank, nor did he then tell Beddingfield that Roberts, and not Crane & Graybill had charge of the shipment of the cotton to Liverpool, as Calhoun & Beddingfield had before that time been informed as to the facts of said shipment, as testified to by Crane & Graybill.

When Bond was introduced no objection was made on account of his having been a stockholder in the Bank.

The Court charged the jury that under the contract sued on, the plaintiff had the right, as against the defendants, to take control of the cotton consigned to Crane & Graybill and dispose of the same; the title to the cotton was conveyed by the bill of exchange here sued on, to plaintiff, and the plaintiff could control it, the plaintiff was the owner of the cotton,

the right of the acceptors does not arise in the case—that if, at the time Beddingfield made the statements to Bond as to the shipment of the cotton to Liverpool, he did not understand his legal rights in the case, then the defendants would not be concluded by such statement; that if they believed from the evidence that the defendants, or either of them, agreed that the cotton should be shipped to Liverpool on their account, then the jury need not necessarily inquire into the regularity of the transaction in Savannah, as proved by Crane & Graybill, as in such case plaintiff will be entitled to recover in this case the difference between the amount of the draft and the proceeds of the cotton realized on the sale thereof, if the jury believe such was the contract.

The jury returned a verdict for plaintiff for $1,020.34 with interest and costs.

A new trial was moved for by defendants for the following alleged errors : Because the Court erred

1st. In holding that Hardy was a competent witness.

2d.   In allowing the draft read to the jury under the evidence aforesaid as to notice of non-payment.

3d. In charging that under the contract sued on, plaintiff had the right to take control of the cotton consigned to Crane & Graybill, and take it out of their possession.

4th. In charging that if the defendants, or either of them, assented to the shipment of the cotton to Liverpool on their account, then it will be unnecessary to inquire into the regularity of the transactions in Savannah, as testified to by Bond, Crane & Graybill, and in said case, plaintiff will be entitled to recover the difference between the amount of the draft and the nett proceeds of the cotton realized on the sale thereof. Because of defendants' mistake in not objecting to Bond as a witness. (This was supported by affidavit of defendant's attorneys, that he knew Bond had been a stockholder in the Bank, and thought that he had objected to him, and that the Court had held him competent.)   And last, because the verdict of the jury was contrary to law and the charge of the Court, and strongly and decidedly against the weight of the evidence.

The Court refused a new trial, and defendants excepted and assign the refusal as error upon the grounds aforesaid.

B. HILL, for plaintiff in error.

JNO. RUTHERFORD, for defendant.

WALKER, J.

The Court did not correctly construe the contract sued on in this case. It is true that Calhoun & Beddingfield were the only defendants, but the question of their liability may depend upon what transpired between the Bank and Crane & Graybill. Calhoun & Beddingfield negotiated this draft, and with the money received for it, purchased the cotton named in it. Crane & Graybill accepted the draft upon the faith of the cotton consigned to them. They were the parties primarily liable on this paper, but to meet that liability the cotton had been consigned to them for sale. Surely the Bank would not be authorized to take the cotton out of their control and still hold them liable to pay the draft; and if the acceptors would be released by the Bank taking possession of the cotton, much more would the drawers be discharged.

Shall the Bank be permitted to recover from the drawers, when it is made to appear that the acceptors have been released from liability by the conduct of the holder? We apprehend not. The holder must have done no act by which a party primarily liable is released, if he would recover from any of those secondarily liable. He must not have deprived them of a remedy over against those primarily liable. If this be so, do not the rights of Crane & Graybill become a material subject of enquiry, in fixing the liability of Calhoun & Beddingfield? It seems so to us.

This cotton was consigned to Crane & Graybill, subject to the payment of this draft. It is true the draft says the legal title is conveyed to the Bank, but the whole transaction was a loan of money, and the transfer of the cotton a security for the repayment of. the loan. The acceptors are the consignees mutually selected by the parties to sell the cotton and pay the

27

draft; the overplus, if any, of the proceeds of the sales, after paying the draft, belongs, not to the Bank, but to Calhoun & Beddingfield. Calhoun & Beddingfield agreed that Crane & Graybill should sell the cotton and pay the draft; such was the written contract, and by that both parties are bound. By what authority, then, did the Bank take possession of the cotton and ship it to a different market? It had no such right, and the Court erred in charging the jury that "under the contract sued on, plaintiff had the right to take control of the cotton consigned to Crane & Graybill, and take it out of their possession." See Printup vs. Johnson, 19 Ga. Rep., 73; Code Sec. 2728. For this error we reverse the judgment of the Court below, and award a new trial.

Some of the other questions cannot arise on another trial; and the remainder can be more satisfactorily passed upon when all the parties shall have had an opportunity to be heard.

Judgment reversed.